UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FATHER& SON MOVING & STORAGE, MOVING AND STORAGE, INC., d/b/a NEIGHBORS MOVING AND STORAGE, AMERICAN VAN LINES, INC., MBM MOVING SYSTEMS, LLC, NATIONWIDE RELOCATION SERVICES, INC., AND COLONIAL VAN LINES, INC., <br>          Plaintiffs <br><br> v. <br><br> XPRESS MOVERS, LLC, MARTIN PANAYOTOV, STOIL ANDREEV, and ADVANCED INTERACTIVE, LLC, <br>          Defendants. | No. 1:12-cv-12262-GAO |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MARTIN PANAYOTOV'S MOTION FOR JUDGMENT ON THE PLEADINGS**

TABLE OF CONTENTS

I.      INTRODUCTION. ………………………………………….....1

A.      A STRONG PUBLIC POLICY PROTECTING the FREE FLOW OF INFORMATION BY
        LIMITING REGULATION AND EXPOSURE TO CIVIL LIABILITY IS EMBODIED IN THE
        STATUTORY IMMUNITY PROVIDED BY 47 U.S.C. § 230………………………….....2

B.      ALLEGATIONS SET FORTH IN PLAINTIFFS' COMPLAINT. ……………………….6

        1.      Allegations Relating to MyMovingReviews.com.………………………….6

        2.      The Plaintiffs' Theories of Liability ..…………………………………….10

II.     ARGUMENT. ………………………………………………………….....11

A.      STANDARD OF REVIEW FOR MOTION FOR JUDGMENT ON THE PLEADINGS…………..11

B.      SECTION 230 OF THE COMMUNICATIONS DECENCY ACT MANDATES DISMISSAL OF THIS
        ACTION (ALL COUNTS). . ……………………………………………………. ………..12

        1.      The Defendant is a Provider of an Interactive Computer Service…………..13

        2.      Plaintiffs Claims are Based upon on the Publication of "Information
                Provided by Another."……………………………………… ………………..13

        3.      Plaintiffs Seek to Hold the Defendant Liable as the Publisher or Speaker of
                Information or Content Provided by Others…………………………………16

        4.      An Inquiry into the Motives of the Service Provider is Improper in Light of
                the Nature of the Statutory Immunity……………………………………..18

        5.      The Fact that MyMovingReviews.com Creates Aggregated Ratings Based
                on Third Party Content Does not Take it Outside of the Section 230
                Immunity……………………………………………………………………..19

C.      THE PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED THE ELEMENTS OF A CLAIM
        FOR FALSE ADVERTISING OR UNFAIR COMPETITION UNDER THE LANHAM ACT OR
        STATE COMMON LAW…………………………………………………………….20

        1.      Xpress Movers is Accredited by the Better Business Bureau. …………….21

977524.1

2.      The defendant Did Not Falsely Represent The Content of MyMoving
        Reviews.com.". …………………………………………………. ……….....22

3.      The Defendant Did Not Falsely Represent That Xpress Movers Has 5 Star
        Ratings And A Lack Of Positive Ratings And That The Plaintiffs Have
        Negative Ratings And A Lack Of Positive Reviews At
        MyMovingReviews.com. ……………………….................................................23

4.      The Defendant Did Not Falsely Represent That The Defendants Present
        Authentic Reviews From Real Consumers And Can Accurately Determine
        Which Reviews Are "Fake" And Effectively Filter
        them.…………………………………………………………………….24

D.      THE PLAINTIFFS HAVE NOT PLED THE NECESSARY ELEMENTS OR FACTS THAT WOULD
        SUPPORT A CLAIM FOR TORTIOUS INTERFERENCE (COUNT IV)….………………..25

E.      THE PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR VIOLATION OF M.G.L. C. 93A,
        § 11………………………………. ……………………………………………..25

III.    CONCLUSION…………………. …………………………………………..27

## EXHIBITS

EXHIBIT 1 - Company Detail Printouts, U.S. Department of Transportation Federal Motor Carrier
        Safety Administration, *available at* http://ai.fmcsa.dot.gov/hhg/search.asp

EXHIBIT 2 - Senate Committee on Commerce, Science, and Transportation, *Internet Moving
        Brokers a New Consumer Protection Problem in the Household Goods Moving
        Industry* (Sept. 19, 2012)

EXHIBIT 3 – Printout: www.mymovingreviews.com/about/php

EXHIBIT 4 – Printout: www.mymovingreviews.com/questions/dispute-a-moving-review/

EXHIBIT 5 – Printout: www.mymovingreviews.com/terms-of-service.php

EXHIBIT 6 – Printout: www.bbb.org/boston/business-reviews/movers/xpress-movers-llc-in-
        wilmington-ma-102458/#

# TABLE OF AUTHORITIES

## CASES

*Arruda & Beaudoin v. Astrue*, 2013 U.S.Dist.LEXIS 47166 (D. Mass. Mar. 27, 2013) ----------- 12

*Ascentive, LLC v. Opinions Corp*., 842 F.Supp. 2d 450 (E.D.N.Y. 2011) ------------------------- 4, 15

*Asia Econ. Inst. v. Xcentric Ventures LLC*, 2011 U.S.Dist.LEXIS 145380 (C.D. Cal. May 4, 2011) ------------------------------------------------------------------------------------------------------ 4

*Aspinall v. Philip Morris Cos.*, 442 Mass. 381 (2004) ------------------------------------------------- 27

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (U.S. 2007) ----------------------------------------------- 11

*Blackstone v. Cashman*, 448 Mass. 255 (2007) ---------------------------------------------------------- 25

*Camel Hair & Cashmere Institute, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6 (1st Cir. 1986) ---------------------------------------------------------------------------------------------------------- 22

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ----------------------------- 13, 20

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302 (1st Cir. 2002) ------------- 20

*Cavicchi v. Koski*, 67 Mass. App. Ct. 654 (2006) ------------------------------------------------------- 25

*Chervin v. Travelers Ins. Co.*, 448 Mass. 95 (2006) ---------------------------------------------------- 26

*Chi. Lawyers' Comm. for Civ. Rights Under the Law, Inc. v. Craigslist, Inc.*, 461 F. Supp. 2d 681 (N.D. Ill. 2006) ----------------------------------------------------------------------------------------------- 4

*Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) --------------------------------- 7

*Dear v. Devaney*, 83 Mass. App. Ct. 285 (2013) -------------------------------------------------------- 25

*Erlich v. Ouellette, Labonte, Roberge, & Allen, P.A.*, 637 F.3d 32 (1st Cir. 2011) ---------------- 11

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc) ------------------------------------------------------------------ 4, 5, 17, 19

*Famm Steel, Inc. v. Sovereign Bank*, 571 F.3d 93 (1st Cir. 2009) ------------------------------------- 26

*Gentry v. EBay, Inc.*, 99 Cal. App. 4th 816 (2002) -------------------------------------------------- 19, 20

*In re Lane*, 937 F.2d 694 (1st Cir. 1991) ----------------------------------------------------------------- 11

*Jasty v. Wright Med. Tech., Inc.*, 528 F.3d 28 (1st Cir. 2008) ----------------------------------------- 26

*JSB Indus. v. Nexus Payroll Servs., Inc.*, 463 F. Supp. 2d 103 (D. Mass. 2006) --------------------- 26

*Kurker v. Hill*, 44 Mass. App. Ct. 184 (1998) ----------------------------------------------------------- 25

*Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 396 N.E.2d 149 (1979) ---------------- 26

*Levitt v. Yelp! Inc.*, No. C-10-1321, 2011 U.S.Dist. LEXIS 124082 (N.D.Cal. Oct. 26, 2011) --- 5, 17, 20

*Massachusetts Laborers' Health & Welfare Fund, by and Through its Trustees v. Philip Morris, Inc.*, 62 F. Supp. 2d 236 (D. Mass. 1999) ------------------------------------------------------------- 11

*Massachusetts Sch. of Law v. ABA*, 142 F.3d 26 (1st Cir. 1998) --------------------------------- 26, 27

*Nollet v. Justices of the Trial Court of Mass.*, 83 F.Supp.2d 204 (D. Mass. 2000) ----------------- 12

*Palmer v. Champion Mortgage*, 465 F.3d 24  (1st Cir. 2006) ----------------------------------------- 12

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241 (3d Cir. 2011) ------------------- 24

*Rivera v. Rhode Island*, 402 F.3d 27, 33 (1st Cir. 2005) ----------------------------------------------- 11

*Schwanbeck v. Federal-Mogul Corp.*, 31 Mass. App. Ct. 390 (1991) ------------------------------- 27

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ------------------------------------------- 11

*Stratton Oakmont v. Prodigy Servs. Co.*, 1995 N.Y. Misc. LEXIS 229, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ----------------------------------------------------------------------------------- 3

*Universal Communication Systems, Inc. v. Lycos, Inc.*, 478 F.3d 415 (1st Cir. 2007) -------------- 4

*Watterson v. Page*, 987 F.2d 1 (1st Cir. 1993) ------------------------------------------------------------ 6

*Weber v. Community Teamwork, Inc.*, 434 Mass. 761 (2001) ------------------------------------------ 25

iv

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) -------------------------------------------------- 3

<u>STATUTES</u>

15 U.S.C. § 1125(a) ------------------------------------------------------------------------------------- 20
M.G.L. c. 93A, § 11-------------------------------------------------------------------------------iii, 10, 22, 26

<u>OTHER AUTHORITIES</u>

Jeff Kosseff, *Defending Section 230: The Value of Intermediary Immunity*, 15 J. Tech. L. & Pol'y
    123, 128 (Dec. 2010) -------------------------------------------------------------------------------------- 2

<u>RULES</u>

Fed. R.Civ. P. 12(c) ------------------------------------------------------------------------------------- 11

<u>TREATISES</u>

Restatement (Third) of Unfair Competition, § 2---------------------------------------------------------- 20

v

Defendant Martin Panayotov ("Panayotov" or "the defendant") respectfully submits this memorandum of law in support of his motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(b)(2).

## I.    INTRODUCTION

In this action, six plaintiff moving companies or moving brokers[1] ask this Court to treat the defendants as the publishers or speakers of third party content posted on a consumer review website, MyMovingReviews.com. The plaintiffs allege that Panayotov, along with the other defendants, operates a website that allows consumers to post reviews of the plaintiffs' services and the services of other, moving companies, including defendant Xpress Movers, LLC ("Xpress Movers"). The plaintiffs further allege that Panayotov is involved in selecting which reviews are visible to visitors to the website. The plaintiffs do <u>not</u> allege that Panayotov authors any of the reviews posted on the website or alters content that is submitted by third parties. The plaintiffs merely allege that the defendant's exercise of his role as the website publisher or editor is biased against them. These allegations bring the case squarely within the federal statutory immunity provided to internet service providers, such as website operators, pursuant to the Communications Decency Act ("CDA"), 47 U.S.C. § 230. Accordingly, the analysis of the claims in this case should begin an end with an application of that statute to the allegations in the Complaint, and the Complaint should be dismissed as a result.

---

[1] The plaintiffs characterize themselves as "provid[ing] moving-related services to consumers." Complaint ¶¶ 5-10. It is not clear that they are all separate entities, as at least two, American Van Lines and MBM Moving System, LLC, share a common DOT registration number, #1757726. *See* Exhibit 1, Company Detail Printouts, *available at* http://ai.fmcsa.dot.gov/hhg/search.asp. Another of the plaintiffs, Neighbors Moving & Storage, Inc., does not have an active DOT license. *Id.*

A.    **A Strong Public Policy Protecting the Free Flow of Information by Limiting Regulation and Exposure to Civil Liability Is Embodied in the Statutory Immunity Provided by 47 U.S.C. § 230.**

The United States Congress has expressed a very clear policy of encouraging the free exchange of information with limited government regulation, while fostering market competition and the development of internet-related technologies, including the development of filtering software intended to detect objectionable content. These policies are expressly set forth in the text of the CDA, 47 U.S.C. § 230[2] ("Section 230"): "[i]t is the policy of the United States to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services," "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation," and to "remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material. 47 U.S.C. § 230(b)(2), (3), (4).

Section 230 is noteworthy for its repeated emphasis on protecting interactive computer service providers, such as Panayotov is alleged to be, not only from liability, but from any and all claims arising out of their conduct as service providers. For example, 47 U.S.C. § 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Similarly, § 230(c)(2)[3] protects both providers and users of an interactive computer services from liability for "any action voluntarily taken in good faith to restrict access to or availability of

---

[2] For a helpful discussion of the circumstances that led to Congress's enactment of the CDA and how it has been applied since 1996, *see* Jeff Kosseff, *Defending Section 230: The Value of Intermediary Immunity*, 15 J. Tech. L. & Pol'y 123, 128 (Dec. 2010).
[3] The defendant does not specifically rely on this subsection, as it is facially inapplicable to the claims made here, but it is further evidence of Congress's policy of protecting website operators from civil liability.

material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively

violent, harassing, or otherwise objectionable." The statute specifically addresses state law

claims as well, providing: "[n]o cause of action may be brought and or liability may be imposed

under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

In one of the earliest cases construing the statute, a 1997 decision that has been followed

and cited with approval by numerous other federal and state appellate and trial courts, the Fourth

Circuit Court of Appeals held that Congress intended that Section 230 provide an immunity to

website operators, based on weighty policy considerations:

> The purpose of this statutory immunity is not difficult to discern. Congress
> recognized the threat that tort-based lawsuits pose to freedom of speech in the
> new and burgeoning Internet medium. The imposition of tort liability on service
> providers for the communications of others represented, for Congress, simply
> another form of intrusive government regulation of speech.

*Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). Noting that, at the time, because

there were "millions" of users of the internet, the number of communications being disseminated

by internet service providers was "staggering," and therefore the "specter of tort liability in an

area of such prolific speech would have an obvious chilling effect." *Id.* at 331. In addition, the

court noted that Congress intended that the protections provided by Section 230 remove the

disincentives to self-regulation created by a 1997 New York state court case decision,[4] because

that decision exposed computer service providers who took  affirmative steps to attempt to

identify and regulate offensive, illegal, or defamatory material to the liability of a publisher. *Id.*

Removing the disincentives to self-regulation, Congress determined, would foster the

development of technologies capable of blocking and filtering objectionable material submitted

by third parties.

---

[4]  *See Stratton Oakmont v. Prodigy Servs. Co.*, 1995 N.Y. Misc. LEXIS 229, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (holding Prodigy liable for defamatory comments made by an unidentified party on one of its bulletin boards, applying the strict liability standard normally applied to original publishers of defamatory statements).

It is now well-settled that Section 230 is to be broadly applied to "bar a panoply of torts." *Ascentive, LLC v. Opinions Corp*., 842 F.Supp. 2d 450 (E.D.N.Y. 2011) (quoting *Asia Econ. Inst. v. Xcentric Ventures LLC*, 2011 U.S.Dist.LEXIS 145380, *21-23 (C.D. Cal. May 4, 2011) (collecting cases). The courts interpreting Section 230 have overwhelmingly held that the statute provides a categorical immunity to internet service providers, including website operators. *See Universal Communication Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413, 415 (1st Cir. 2007) ("In Section 230 of the Communications Decency Act (CDA), 47 U.S.C. § 230, Congress has granted broad immunity to entities, such as Lycos, that facilitate the speech of others on the Internet"); *see also*, *Chi. Lawyers' Comm. for Civ. Rights Under the Law, Inc. v. Craigslist, Inc.*, 461 F. Supp. 2d 681, 689-690 (N.D. Ill. 2006) (collecting cases). The Ninth Circuit Court of Appeals has explained:

> We must keep firmly in mind that this is an immunity statute we are expounding, a provision enacted to protect websites against the evil of liability for failure to remove offensive content. Websites are complicated enterprises, and there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality. Such close cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged-or at least tacitly assented to-the illegality of third parties. Where it is very clear that the website directly participates in developing the alleged illegality . . . immunity will be lost. But in cases of enhancement by implication or development by inference ... section 230 must be interpreted to protect websites not merely from ultimate liability, but  from having to fight costly and protracted legal battles.

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174-75 (9th Cir. 2008) (en banc).

The threat of litigation, or the actual institution of litigation, with its concomitant expenses, inconveniences, public disclosures, and publicity, has the potential to seriously chill free expression and healthy competition, as well as the development of technology and software

977524.1

designed to guard against internet fraud and abuse. *See, e.g.*, *Levitt v. Yelp! Inc.*, No. C-10-1321, 2011 U.S.Dist. LEXIS 124082, *27 (N.D.Cal. Oct. 26, 2011) (citing the explicit statements of public policy included in the CDA by Congress).  An immunity from suit, unlike a defense to a claim on its merit, protects the immunized party from those potential harms—and its protection is effectively lost if a case is erroneously permitted to proceed into discovery or even trial. Accordingly, "close cases. . . must be resolved in favor of immunity." *Roommates.com*, 521 F.3d at 1174.

Websites such as MyMovingReviews.com serve an important function in today's increasingly internet-based economy, in allowing customers to educate themselves and gain information from multiple sources. This is crucial in an industry where customers are not likely to be repeat customers, such as the moving services industry, and where there is a documented, pervasive patterns of deceptive, abusive, and in some cases, even criminal conduct by companies targeting consumers. In fact, the Senate Committee on Commerce, Science, and Transportation conducted an investigation and issued a report in 2012, entitled "Internet Moving Brokers a New Consumer Protection Problem in the Household Goods Moving Industry." *See* Exhibit 2. The Committee found that companies, including some of the plaintiffs companies, were engaged in "gaming" internet search engines to boost their company names in internet searches, using misleading websites, using multiple names or names similar to other companies to increase customer confusion, charging unreasonable and/or hidden fees, and even taking, customers' goods "hostage." *Id. at* 13-26. Sites such as MyMovingReviews.com are thus an important player in the online free market.

MyMovingReviews.com's value to consumers is that it provides information; in order to increase the value of that information, its operators employ software intended to filter inauthentic

977524.1

content. As stated on  the website, "[w]e are very serious about reviews quality. Our

sophisticated consumer reports rating system filters the fake local and cross country moving

reviews from the real reviews." *See* Complaint, Ex. A. The CDA was expressly intended to allow

the market to regulate these types of communications, and to foster the development of

algorithms of the type that are used on MyMovingReviews.com. What the plaintiffs seek to do,

via tort theories of recovery and claims for injunctive relief, is exactly what Section 230 is

intended to prevent. Accordingly, the plaintiffs' claims must be dismissed.

Dist. LEXIS at *23 (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)).

**B.      ALLEGATIONS SET FORTH IN PLAINTIFFS' COMPLAINT[5]**

        The allegations in the plaintiffs' complaint make it abundantly clear that the claims they

seek to assert against Panayotov are statutorily barred by Section 230. Although the plaintiffs

attempt to allege conduct or motives that they believe bring Panayotov's alleged conduct outside

of the bounds of the immunity, allegations of improper motives cannot be considered in

connection with an analysis of Section 230, and, moreover the type of sketchy and speculative

allegations presented by the plaintiffs are insufficient to allow this case to proceed beyond the

pleadings stage.

        **1.      Allegations Relating to MyMovingReviews.com**

        The plaintiffs allege that defendants Panayotov and Stoil Andreev ("Andreev") own and

operate a consumer review website MyMovingReviews.com ("MyMovingReviews.com" or "the

website"). Complaint ¶ 2. The plaintiffs allege that Panayotov and Andreev also own and operate

a moving company, defendant Xpress Movers, LLC ("Xpress Movers") that they claim competes

with their businesses. *Id.*

---

[5] While treating the plaintiffs' allegations as true for the purposes of this motion, the defendant disputes many of the
allegations contained in the plaintiffs' Complaint and reserves the right to contest them at trial.

977524.1

MyMovingReviews.com is a website where consumers may submit moving company reviews and read reviews posted by other consumers. As explained on the website,[6] "[a]lthough we filter the reviews we suspect are fake and/or do not comply with our terms of service, we are aware that no algorihm [sic] is perfect and some reviews may be posted that are not authentic. In that case, please contact us so we can take the appropriate action." *See* Exhibit 3, www.mymovingreviews.com/about/php. Companies may dispute reviews on several grounds. *See* Exhibit 4, www.mymovingreviews.com/questions/dispute-a-moving-review/. The Terms of Service of the website make it clear that the website operators reserve the right to exercise editorial discretion with regard which reviews it publishes and which it does not. *See* Exhibit 5, www.mymovingreviews.com/terms-of-service.php.

The plaintiffs complaint that "the defendants," without any more particularized attribution of responsibility for the alleged conduct, "have deleted positive, legitimate reviews" about their services and have removed negative reviews about the defendants' services on MyMovingReviews.com. *Id.* ¶ 3. The plaintiffs essentially claim that the defendants select which reviews, submitted by third parties, will be made visible to visitors to the website, and that they selection process is "biased" in favor of "affiliated" companies.

The plaintiffs further complain that statements made on MyMovingReviews.com are false or misleading. Specifically, they note that the defendants represent on the website that MyMovingReviews.com provides visitors with: "real customers' moving experiences and moving testimonials," ratings from "actual customers," and "authentic local, state to state and

---

[6] Because the website is central to the plaintiffs' Complaint, and the Complaint specifically references and actually attaches incomplete portions of pages from the website, the contents of the website should be considered in ruling on this motion. *See Watterson*, 987 F.2d at 3 (citing *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("The problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff . . . Where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.")

cross country moving company reviews." *Id.* ¶ 19. The plaintiffs allege, wholly in conclusory fashion, that these statements are false. The plaintiffs do <u>not</u> allege that Panayotov creates any of the moving company reviews on the site, or alters any submitted by third parties, only that he participates in the decision of which reviews to publish.

The plaintiffs acknowledge that the MyMovingReviews.com uses an algorithm to automatically review submissions. They cite to language on the website that informs visitors that a "sophisticated consumer reports rating system filters the fake local and cross country moving reviews from the real reviews so you can see the most accurate and up to date rating information to base your decision on." *Id.* ¶ 19. Notably, although the plaintiffs allege that Panayotov makes false claims of "neutrality," none of the exhibits that they attach to their Complaint—all of are represented to be printouts from the website—contains any such statements.[7]

With regard to defendant Xpress Movers, the plaintiffs complaint that it has a "perfect, 5-star rating on MyMovingReviews.com," while on another consumer review website, Yelp.com, its has a 2.5 star rating. *Id.* at ¶ 24, 28. The plaintiffs allege that the defendants remove negative reviews about Xpress Movers from MyMovingReviews.com and Yelp in order to improve Xpress Movers' rating on those sites. *Id.* at ¶¶ 25, 27-28. As factual support for this claim, the plaintiffs allege that on August 21, 2012, one negative review of Xpress Movers, allegedly authored by "AprilS," was filtered from visibility on MyMovingReviews.com. *Id.* ¶¶ 26-27, Exhibit C. Notably, the plaintiffs do not allege that this negative review was an authentic one

---

[7] This is not to say that Panayotov concedes that the website is biased. However, this fact is noted because, notwithstanding the plaintiffs' characterization of statements made on the website, they should "speak for themselves," and, moreover, there is nothing unsavory about the fact that a website collects advertising revenue in order to fund its operations.

977524.1

from an actual customer of Xpress Movers.[8] The plaintiffs also allege that defendant Xpress

Movers has falsely claimed to be accredited by the Better Business Bureau. *Id.* at ¶¶ 29-32.

The plaintiffs allege that they hired an "IT specialist" to post fake reviews on

MyMovingReviews.com from different IP addresses. *Id.* at ¶ 34. Some of these reviews were

allegedly filtered. *Id.* Only three of the named plaintiffs allege specific instances of positive

reviews of their companies being filtered:

- Colonial Van Lines, Inc. claims that, over the course of two months in 2012, it posted two fake reviews of its own services to MyMovingReviews.com, and that the positive one was filtered,[9] but the negative one was not. *Id.* at ¶¶ 37-37. It also claims that a "real"[10] positive review posted on July 17, 2012 was filtered from the website. *Id.* at ¶ 38.

- Nationwide Relocation Services, Inc. claims that, over the course of three months, it posted one fake positive review of its services, which was filtered, and one "real" positive review, which was also was filtered. *Id.* at ¶¶ 39-40.

- American Van Lines, Inc. claims that, over the course of three months, a review that it claims was "real" but which it submitted to MyMovingReviews.com itself, was filtered, and that a second positive review from an actual customer was filtered.[11] *Id.* at ¶¶ 41, 43. In addition, it claims that it posted a fake negative review that was not filtered. *Id.* at ¶ 42.

To summarize, only three of the plaintiffs alleged instances of improper filtering that affected

their profiles. They claim that two admittedly fake positive reviews that they themselves

submitted about themselves were filtered, that one positive review that one of the plaintiffs

submitted about itself (purportedly on behalf of a customer) was filtered, that two "real" positive

---

[8] Interestingly, the plaintiffs have attached a screenshot of an email confirming receipt of AprilS's review by MyMovingReviews.com, which begs the question of how the plaintiffs had access to AprilS's email account. *See* Complaint, Ex. B at 2.

[9] In addition to the fact that the reviews were properly filtered because they were inauthentic, the positive review that was filtered, may have been filtered violating the Terms of Service because it contained references to the experiences (negative) of another customer that was not the reviewer.

[10] The word "real" is put in quotation marks, because as neither the plaintiffs nor the defendants are alleged to have authored or submitted the allegedly "real" review, the plaintiffs' claim that it was an authentic review is pure speculation.

[11] The supposed "authentic" of review American Van Lines from Gregory Wibbels supposedly echoed a Customer Service Quality Review Survey that he completed; however, the Customer Service Quality Review Survey that was attached as an Exhibit to the Complaint identified the carrier as "Colonial." *See* Complaint, Ex. I at 2.

9

reviews were improperly filtered, and that two fake negative reviews that they themselves submitted were not filtered, but should have been. The other three named plaintiffs, Father & Son Moving & Storage, Moving & Storage, Inc. d/b/a Neighbors Moving and Storage, and MBM Moving Systems, LLC have not alleged that any reviews of their companies, whether real or fake, positive or negative, have been filtered.

### 2.     The Plaintiffs' Theories of Liability

The plaintiffs have asserted four counts against the defendants. Counts I and III asserts a claims for false advertising and unfair competition under the Lanham Act, 15 U.S.C. § 1125 and state common law. Count II asserts a claim for state law consumer protection violations pursuant to M.G.L. c. 93A, § 11, and Count IV asserts a claim for "tortious interference." Each of these claims is based on the same alleged conduct: that the defendant selectively filters reviews submitted by third parties in a manner that is biased against the plaintiffs; that the defendant falsely claims that the website is neutral and unbiased; and that the website claims to be able to "accurately filter 'fake' reviews from real ones, and to only include 'real' reviews." *Id.* ¶ 57. The plaintiffs make conclusory allegations that they have suffered damage to their reputations, their relationships with existing and prospective customers, and lost business opportunities. *Id.* ¶ 59.

Nowhere, anywhere in the Complaint, do the plaintiffs allege that Panayotov authored any of the website content specifically relating to their companies. Similarly, the plaintiffs fail to allege any particulars regarding lost customers, reduced revenues, customer confusion, or any other indicia of actual harm resulting from the conduct alleged. Having failed to allege any actionable conduct by Panayotov or identify any redressable injury as a result of his alleged conduct, the plaintiffs have failed to state a claim on which relief can be granted by this Court.

## II.     ARGUMENT

### A.     STANDARD OF REVIEW FOR MOTION FOR JUDGMENT ON THE PLEADINGS

The standard for ruling on a motion for judgment on the pleadings, brought pursuant to Fed. R.Civ. P. 12(c), is essentially the same as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Erlich v. Ouellette, Labonte, Roberge, & Allen, P.A.*, 637 F.3d 32 (1st Cir. 2011). Under this standard, the Court must take the plaintiffs' factual allegations as true and make all reasonable inferences in their favor. *Rivera v. Rhode Island*, 402 F.3d 27, 33 (1st Cir. 2005).  However, the Court must grant a motion to dismiss for failure to state a claim on which relief can be granted where the factual allegations are insufficient to "raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (U.S. 2007).

In reviewing the sufficiency of a complaint, courts should not accept as true legal conclusions couched as factual allegations.  *Id.* at 555; *see also Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  Likewise, "[c]onclusions that are not supported by the facts that are alleged in the complaint 'deserve no deference.'" *Massachusetts Laborers' Health & Welfare Fund, by and Through its Trustees v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 240-241 (D. Mass. 1999) (citations omitted). "[S]ummary legal conclusions that are contradicted or 'belied by the facts alleged' may be disregarded." *Id.* (quoting *In re Lane*, 937 F.2d 694, 698 n.7 (1st Cir. 1991)). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 678. Unsupported conclusions and assertions are not entitled

11

to credit under this standard. *Universal Communication Systems, Inc.*, 478 F.3d at 415 (citing

*Palmer v. Champion Mortgage*, 465 F.3d 24, 25 (1st Cir. 2006)).

In ruling on a motion to dismiss or a motion for judgment on the pleadings, the Court

may consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated

by reference in the complaint and matters of which judicial notice can be taken." *Arruda &*

*Beaudoin v. Astrue*, 2013 U.S.Dist.LEXIS 47166, *22-23 (D. Mass. Mar. 27, 2013) (citing *Nollet*

*v. Justices of the Trial Court of Mass.*, 83 F.Supp.2d 204, 208 (D. Mass. 2000), *aff'd*, 248 F.3d

1127 (1st Cir. 2000)).  In addition, the Court may consider "documents the authenticity of which

are not disputed by the parties," "official public records," and documents that are either central to

plaintiffs' claim or which are "sufficiently referred to in the complaint." *Arruda & Beaudoin*,

2013 U.S.

**B.**   **SECTION 230 OF THE COMMUNICATIONS DECENCY ACT MANDATES DISMISSAL OF THIS ACTION (ALL COUNTS).**

The First Circuit has held that Section 230 provides an immunity that is properly raised in

a motion to dismiss for failure to state a claim on which relief can be granted. *See Universal*

*Communication Systems*, 478 F.3d at 415 (dismissing plaintiff's complaint on motion to dismiss

for failure to state a claim on the basis of Section 230 immunity). That court held that the

immunity is applicable if: (1) the defendant is alleged to be a "provider or user of an interactive

computer service"; (2) "the claim is based on 'information provided by another information

content provider"; and (3) the claim seeks to treat the defendant "as the publisher or speaker" of

that information."   *Id.* at 418. The First Circuit has held that, in light of Congressional intent and

consistent with other courts' interpretation of the statute, "Section 230 immunity should be

broadly construed." *Id.* at 419.

12

1.      **The Defendant is a Provider of an Interactive Computer Service.**

The plaintiffs allege that Panayotov is the operator of MyMovingReviews.com. Complaint ¶ 11. A website operator is, as defined by Section 230, a provider of an "interactive computer service," i.e., a provider of an "information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). *See* Complaint at ¶ 11 (alleging that "Mr. Panayotov is 'Managing Director of Xpress Movers, LLC, and an operator fo the website MyMovingReviews.com"), ¶ 21. First Circuit precedent supports this conclusion: "web site operators. . . are providers of interactive computer services within the meaning of Section 230." *Universal Commun. Systems. v Lycos, Inc.* 478 F.3d at 419 (citing *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)). As a website operator, Panayotov is immune from claims seeking to treat him as the "publisher or speaker" content provided by third parties.

2.      **Plaintiffs Claims are Based upon on the Publication of "Information Provided by Another."**

The plaintiffs' central factual allegation is that that Panayotov selectively filters reviews submitted by third parties, in order to benefit a particular moving company and put others at a disadvantage. Thus, the objectionable content—reviews submitted by third parties for publication on the website—falls squarely within the statutory definition of "information provided by another information content provider" as defined at 47 U.S.C. § 23(f)(3). *Universal Commun. Sys. v Lycos, Inc.* 478 F.3d at 419. The plaintiffs make no claim that Panayotov authored, in whole or in part, any of the reviews, positive or negative, that were posted on MyMovingReviews.com. Nor have they alleged any facts that would give rise to an inference that Panayotov was "'responsible,' even 'in part,' 'for the creation or development' of the alleged misinformation." *Id.* at 420.

13

Although the plaintiffs, attempting to plead around the Section 230 immunity, attempt to premise some liability on statements made on the website regarding the "neutrality" of the website and the automated filtering process employed in order to detect "inauthentic" reviews or reviews which violate the site's Terms of Service, these claims are insufficient to avoid the immunity. In the first place, the plaintiffs mischaracterize the statements made on the website, as demonstrated by the Exhibits they attach to the complaint, and as discussed more fully, *infra*, section III.A. The website makes no affirmative statement or guarantee that its filters are one hundred percent accurate, and the fact that a company is permitted to dispute reviews demonstrates that such a guarantee is not contemplated. reviews were most prominent).

Furthermore, those statements must be read in conjunction with the websites's Terms and Conditions. *See, e.g.*, *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003) ("Though AOL reserved the right to remove messages deemed not in compliance with the Community Guidelines, it expressly disclaimed liability for failure or delay in removing such messages.") MyMovingReviews.com's Terms and Conditions provide, in part:

**1.      DESCRIPTION OF OUR WEBSITE**
Our Web Site consists of text, software, photographs, graphics, illustrations, artwork, video, music, sound, names, logos, trademarks, service marks and other content ("Content") that is published, posted, uploaded, distributed, disseminated or otherwise made available  ("Posted") to the general public. Our Web Site is dedicated to providing a means of organizing and displaying material created by third parties. Our Web Site's Content includes but is not limited to ratings, comments, discussions, and links to other services. The Content conveyed by the site is the responsibility of the third party creators. We have no responsibility for such content and are merely providing access to such Content as a service to you. The nature of the Web Site encourages open discussion, which may result in the automatic posting of offensive, harmful, inaccurate or otherwise inappropriate material, or in some cases material that has been mislabeled or is otherwise deceptive. Users of our Web Site are expected to exercise caution, common sense, and proper judgment when viewing this Content.
*        *        *
**14.     NO LIABILITY FOR CONTENT**

14

> We do not endorse, support, represent or guaranty the truthfulness, accuracy, or reliability of any Content Posted on our Web Site. You acknowledge that any reliance on material Posted on our Web Site will be at your own risk.  We cannot monitor all Content that is Posted on our Web Site, and therefore we have no obligation to monitor the Content. However, we reserve the right at all times to disclose any information as necessary to satisfy any applicable law, regulation, legal process or governmental request, or to edit, refuse to post or to remove any information or materials, in whole or in part, for any reason whatsoever, at our sole discretion.

Terms and Conditions, Exhibit 4.

The organization of the website, and information about the site's policies and Terms of Service do not create an independent ground for liability. *See, e.g.*, *Goddard v. Google*, 640 F.Supp. 2d 1193, 1198 (N.D.Cal. 2009) (noting that where allegedly misleading postings were "contrary to Google's express policy," that fact cut <u>against</u> a finding that a service provider crossed the line into being a content provider or "co-developer");  *see also Ascentive, LLC*, 842 F.Supp. 2d at 474-475 (holding that plaintiffs did not adequately allege that website operator was "content provider" where allegations did not claim that operator authored reviews, only that operator "encourage[d] and create[d] the most negative postings it can" and organized site so that negative reviews were most prominent).

In the second place, allowing plaintiffs to make an "end run" around the Section 230 immunity by premising liability on introductory information about the website and the source of its third party content would destroy the utility of the immunity. If plaintiffs could avoid the immunity simply by alleging that they were harmed as a result of general information describing the website or its purpose on a service provider's page, the immunity could only apply where a website simply acted as a literal bulletin board, with no other explanatory content or organizational information to facilitate visitors' use of the site.

15

3.     **Plaintiffs Seek to Hold the Defendant Liable as the Publisher or Speaker of Information or Content Provided by Others.**

A service provider's "exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content" are immunized by Section 230. *Universal Commun. Sys.*, 478 F.3d at 421 (quoting *Zeran*, 129 F.3d at 330). In the case presented to this Court, the plaintiffs allege no more than that. Essentially, the plaintiffs claim that Panayotov, alone or in concert with the co-defendants, manipulates which consumer reviews will be made visible to visitors to MyMovingReviews.com, and does so with a bias in favor of defendant Xpress Movers and against the plaintiff companies. However, it is now well established that allegations of "manipulation" of third party content do not turn a service provider into a content provider, because choosing which third party content to publish, not publish, or remove is precisely the conduct immunized under the CDA.

For example, in *Universal Communications Systems*, the First Circuit rejected a claim that a service provider could be held liable for failing to prevent content providers from "spread[ing] information more credibly, by doing so under multiple screen names and in a context that is associated with objective content." *Universal Commun. Sys. v Lycos, Inc.* 478 F.3d at 420. In other words, the plaintiffs sought to hold the website operator liable for failing to attempt to filter out inauthentic content.

Here, the plaintiffs attempt to hold Panayotov liable for the opposite—attempting to filter suspect content, for example, reviews not submitted by actual customers. In either scenario, however, the service provider's decisions, are immune from liability. *Id.* at 422 ("immunity applies not only for the service provider's decisions with respect to that posting, but also for its inherent decisions about how to treat postings generally"); *see also Ben Ezra, Weinstein, and Co., Inc. v. America Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) ("By deleting the allegedly

16

inaccurate stock quotation information, Defendant was simply engaging in the editorial functions

Congress sought to protect).

In a similar case recently decided by the district court for the Northern District of

California, claims against the operator of the consumer review website Yelp! were dismissed

pursuant to Section 230 immunity. *Levitt*, 2011 U.S.Dist. LEXIS 124082. In that case, the

plaintiffs had alleged that Yelp! had acted in bad faith with regard to the operation of its website

because it allegedly promised more favorable treatment to businesses that agreed to purchase

advertising from it, and that when the plaintiff companies refused to do so, their aggregate

ratings declined as a result of Yelp's intentional manipulations. *Id.* at *5-6. The district court

held that this failed to state a claim in light of the Section 230 immunity. Quoting the Ninth

Circuit Court of Appeals, the court noted that "any activity that can be boiled down to deciding

whether to exclude material that third parties seek to post on line is perforce immune under

section 230." *Id.* at 20 (quoting *Roommates.com*, 521 F.3d 1157). The alleged reasons that

editorial decisions were made were immaterial. This is consistent with the policy underlying the

immunity, which is to permit market forces to make corrections, rather than imposing

government mandated regulations and restrictions.

The Section 230 immunity applies both to the plaintiff's federal and state law claims. *See*

47 U.S.C. § 230(c)(1) ("[n]o provider or user of an interactive computer service shall be treated

as the publisher or speaker of any information provided by another information content

provider"); 47 U.S.C. § 230(e)(3) ("[n]o cause of action may be brought and or liability may be

imposed under any State or local law that is inconsistent with this section.") Accordingly, as

each of the plaintiffs' counts, for state and federal unfair competition and false advertising,

common law tortious interference, and violations of the state Consumer Protection Act seek to

977524.1

hold Panayotov liable as the publisher or speaker of the reviews posted about either the plaintiff companies or Xpress Movers, the complaint as a whole should be dismissed.

> **4.     An Inquiry into the Motives of the Service Provider is Improper in Light of the Nature of the Statutory Immunity.**

The plaintiffs offer a handful of examples where they claim Panayotov chose which reviews should remain visible on MyMovingReviews.com and which should not. Of the miniscule sample provided, some fake reviews were allegedly filtered, some fake reviews were allegedly allowed to remain visible, and some possibly authentic reviews were filtered. The plaintiffs claim to have been damaged as a result of the alleged "biased" filtering, and claim that it was intended to put them at a disadvantage in competing with Xpress Movers. Thus, the plaintiffs appear to be asserting a theory of "bad faith" editorial decision making, that they presumably hope will bring their claims outside the scope of Section 230. However, this tactic is unavailing.

The protections of Section 230(c)(1) apply categorically, without regard to the service provider's subjective state of mind or motivations. *See, e.g.*, *Green*, 218 F.3d at 470 (upholding immunity for allegedly negligent failure to remove defamatory material after notice); *Ben Ezra*, 206 F.3d at 985-86 (holding that immunity applied where AOL communicated with providers of stock quote information frequently and had at times deleted stock symbols and other information in an effort to correct errors); *Goddard*, 640 F.Supp. 2d at 1197 (holding that immunity applied to Google's Keyword Tool, where Google allegedly knew that its suggested keywords were being used to further fraudulent transactions online); *Zeran*, 129 F.3d at 331-333 (holding that service providers are immune even when they have actual knowledge of falsity); *Asia Economic Ventures LLC*, 2011 U.S.Dist.LEXIS 145380 *18-20 (holding that defendant's deliberate manipulation of software code in favor of paying customers in order to boost search visibility

was immune "[a]bsent a changing of the disputed reports' substantive content that is visible to consumers"); *Gentry v. EBay, Inc.*, 99 Cal. App. 4th 816 (2002).

Allowing an inquiry into the motives of every editorial decision made, whether to allow publication or not of third party content on a service provider website would be untenable and would destroy the statutory protection created by Congress. As the court noted, "traditional editorial functions often include subjective judgments informed by political and financial considerations," so any editorial decision could be perceived or characterized as "biased" or designed to "manipulate." *Levitt*, 2011 U.S.Dist.LEXIS 124082, * 27. In addition, allowing such inquiry could well result in the proverbial litigation "floodgate" opening. As the *Levitt* court, quoting the Ninth Circuit, stated:

> Determining what motives are permissible and what are not could prove problematic. Indeed, from a policy perspective, permitting litigation and scrutiny [sic] motive could result in the "death by ten thousand duck-bites" against which the Ninth Circuit cautioned in interpreting § 230(c)(10).

*Id.* at *27 (quoting *Roommates.com*, 521 F.3d at 1174.

In addition to the policy concerns raised by the idea of inquiring into the motivation for individual editorial decisions of a service provider, the *Levitt* court found support in the language of the statute, noting that where Section 230(c)(1) "contains no explicit exception for impermissible editorial motive," but Section 230(c)(2) does refer to conduct taken in "good faith," then Congress intended that the Section 230(c)(1) immunity would apply regardless of the intent or motive of the service provider. *Levitt*, 2011 U.S.Dist.LEXIS 124082, * 23-24.

### 5. The Fact that MyMovingReviews.com Creates Aggregated Ratings Based on Third Party Content Does not Take it Outside of the Section 230 Immunity.

If Section 230 precludes the courts from taking on the rule of super-editor, with the responsibility of reviewing and second guessing the editorial and publisher decisions of service

977524.1

providers as to whether individual reviews should be published, then it must also preclude a

similar review of the aggregation of those reviews. This is because the aggregate rating is merely

a compilation of the multiple ratings provided by third party content providers. It is not separate

"content" authored by Panayotov. *See Levitt*, 2011 U.S.Dist. LEXIS 124082, *22 (citing *Gentry*,

99 Cal. App. 4th at 834; *Carafano*, 339 F.3d at 1124).

The plaintiffs do not allege that the "star" ratings of their companies do not reflect an

aggregation of the reviews that are posted about those companies. Indeed, the plaintiffs do not

even mention how many stars each respectively has rated on the site at all, choosing to limit their

complaint to the fact that defendant Xpress Movers has a 5 star rating, while on another review

site, it "does not fare so well." These allegations do not describe actionable conduct.

### C.   THE PLAINTIFFS HAVE  NOT ADEQUATELY ALLEGED THE ELEMENTS OF A CLAIM FOR FALSE ADVERTISING OR UNFAIR COMPETITION UNDER THE LANHAM ACT OR STATE COMMON LAW.

The elements of a claim based for false advertising or unfair competition, unrelated to the

use or infringement of a trademark, brought pursuant to the Lanham Act are:

> (1) the defendant made a false or misleading description of fact or representation
> of fact in a commercial advertisement about his own or another's product; (2) the
> misrepresentation is material, in that it is likely to influence the purchasing
> decision;   (3) the misrepresentation actually deceives or has the tendency to
> deceive a substantial segment of its audience; (4) the defendant placed the false or
> misleading statement in interstate commerce; and (5) the plaintiff has been or is
> likely to be injured as a result of the misrepresentation, either by direct diversion
> of sales or by a lessening of goodwill associated with its products.

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 310-311 (1st Cir. 2002);

*see* 15 U.S.C. § 1125(a). A common law claim for false advertising or unfair competition

requires essentially the same elements. *See, e.g.*, Restatement (Third) of Unfair Competition, § 2

("One who, in connection with the marketing of goods or services, makes a representation

relating to the actor's own goods, services, or commercial activities that is likely to deceive or

mislead prospective purchasers to the likely commercial detriment of another under the rule stated in § 3 is subject to liability to the other for the relief appropriate under the rules stated in §§ 35-37.")

Under either of these causes of action, the plaintiffs' Complaint fails to state a claim. Some of the specific "representations" that the plaintiffs alleged support their claim for false advertising fall squarely within the Section 230 immunity. *See* Complaint ¶ 46(c)-(d). Even if they did not, because Panayotov is not alleged to have authored any of the allegedly false reviews on the website, he could not be held liable for false advertising.

Plaintiffs have attempted to plead around the immunity, however, and attacked certain statements that were allegedly authored by Panayotov. Specifically, the plaintiffs claim that the defendants falsely state that Xpress Movers is accredited by the Better Business Bureau ("BBB"), that MyMovingReviews offers "neutral, unbiased ratings," and that all reviews on the website are authentic because the defendants are able to accurately filter them. The plaintiffs fail to state a claim against Panayotov based on any of these representations, however.

### 1.    Xpress Movers is Accredited by the Better Business Bureau.

The plaintiffs allege no facts that would give rise to a reasonable inference that Panayotov personally falsely represented that Xpress Movers was accredited by the BBB. The plaintiffs allege no facts that would give rise to a reasonable inference that the representation is material, or likely to influence a purchasing decision. The fact that a business is "accredited" by the BBB does not provide any information about that business other than the fact that it has paid a fee to the BBB and meets BBB criteria for having policies in place for responding to consumer complaints. *See* Exhibit 6 http://www.bbb.org/boston/business-reviews/movers/xpress-movers-llc-in-wilmington-ma-102458/# ("To be accredited by BBB…BBB must determine that the

977524.1

business meets BBB accreditation standards, which include a commitment to make a good faith

effort to resolve any consumer complaints. BBB Accredited Businesses must pay a fee for

accreditation review/monitoring and for support of BBB services to the public.")  Furthermore,

the plaintiffs have not alleged how this statement did or could likely injure the,.

Finally, Xpress Movers currently is accredited by the BBB. *See* Exhibit 6. The First

Circuit has held that injunctive relief is available upon a "showing that the defendant's activities

are likely to cause confusion or to deceive customers," but that in order to recover damages,  "a

plaintiff must show actual harm to its business, a diversion of sales, for example." *Camel Hair*

*& Cashmere Institute, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986); *see*

*also* M.G.L. c. 93A, § 11. Since at least February 28, 2013, Xpress Movers has been accredited

by the BBB, so the plaintiffs claim is rendered moot insofar as they seek prospective relief. As

they have not alleged any actual injury to their business as a result of this alleged

misrepresentation, their claims should be dismissed.

>   **2.      The Defendant Did Not Falsely Represent The Content Of MyMoving**
>           **Reviews.com."**

Again, although the defendant disputes the plaintiff's allegation that the website is

"biased," either in favor of Xpress Movers or against the plaintiffs, more importantly for

purposes of this motion, despite the plaintiffs' characterizations of statements made on

MyMovingReviews.com, the Exhibits to the plaintiffs' Complaint conclusively demonstrate that

the defendant has  made no representations, that the reviews are "unbiased" or "neutral."  Those

words are not used anywhere. Indeed, any such statement on a consumer review website would

be absurd, given that the purpose of a consumer review website is for consumers to share their

own opinions about service providers such as moving companies. It is the very nature of a

consumer review website to contain "biased" points of view. The plaintiffs simply

mischaracterize the explanatory introductory content of the website in a manner which suits their theory of liability. Thus the alleged "misrepresentation of fact" <u>was never actually made</u> by the defendant, as demonstrated by the plaintiffs' exhibits.

Moreover, what the Exhibits to the Complaint do show is that website informs visitors that reviews are from "actual customers" and that consumers could contact review writers who are willing to discuss their reviews. Complaint, Ex. A. at 3. The site offers visitors the opportunity to "[c]ompare movers based on reviews, consumer reports, testimonials and complaints." *Id.* In addition, the website discloses that there ads on the site, and labels them as such. Visitors are informed that

> The ads on our site are supplied by Google or by MyMoving Reviews. You should research each of the companies before choosing a mover from these ads. You use the companies that are shown in the advertisements at your own risk. We do however ask that you make sure to come post a review after your transaction is completed.

*Id.* These statements put visitors on notice that there is a lot of information available, and that it is us to the visitor to review and evaluate that information in making his or her decision. *See also* Exhibit 5, Terms and Conditions, and the discussion, *supra*, at Section IV.A.2. As no misrepresentation occurred, there can be no claim that the plaintiffs were harmed. Indeed, the plaintiffs fail to allege any facts that would support their claim that these statements have caused or are likely to cause them injury.

**3.      The Defendant Did Not Falsely Represent That Xpress Movers Has 5 Star Ratings And A Lack Of Positive Ratings And That The Plaintiffs Have Negative Ratings And A Lack Of Positive Reviews At MyMovingReviews.com.**

The plaintiffs' allegations on these claims point are wholly conclusory and utterly lacking in any factual foundation. Indeed, three of the six named plaintiffs, Father & Son, Neighbors, and MBM have not alleged that any reviews of their companies, whether real or fake, positive or

negative, have been filtered. Although the plaintiffs claim that Xpress Movers has a lower rating

on another consumer review website, because "ratings" are "opinions" this provides no support

for the claim that the ratings on MyMovingReviews.com are "false." Similarly, they provide

nothing that would suggest that more positive reviews should be visible on the website than are

appearing. The plaintiffs provide no instances of customers or prospective customers deciding

not to use the plaintiffs services as a result of the ratings, or of any other injury resulting form the

use of the aggregate ratings.

> **4.     The Defendant Did Not Falsely Represent That The Defendants Present
> Authentic Reviews From Real Consumers And Can Accurately Determine
> Which Reviews Are "Fake" And Effectively Filter them.**

As to the claim that Panayotov has made representations of fact on the website that "all"

customer reviews are authentic and that the websites' filters are one hundred percent perfect and

accurate, again, those alleged representations appear <u>nowhere</u> on the website. The Exhibits

attached to the Complaint show only that the defendant represents that he uses a "sophisticated

filter to detect reviews that does [sic] not meet our terms of service." Complaint Ex. A at 4. The

plaintiffs' allegations—arguments, more accurately—in the pleadings are once again belied by

exhibits attached to their Complaint.

Furthermore, it is well settled that in a false advertising claim, the court must view the

alleged misrepresentations in the context of the entire accused "advertisement." *Pernod Ricard*

*USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 253 (3d Cir. 2011). Viewing the website as a

whole, including the Terms and Conditions for submitting reviews, information about how

reviews are automatically filtered, and caveats advising consumers to do their own research, it

should be clear that no reasonable consumer would be misled into believing that

MyMovingReviews.com was able to guarantee one hundred percent accuracy in publishing all

authentic reviews and filtering all fake reviews. *See id.* (holding that a court can determine that an advertisement is not false or misleading as a matter of law).

Finally, the plaintiffs have not plausibly alleged that they have been or are likely to be injured as a result of any representations made on the website.

### D.   THE PLAINTIFFS HAVE NOT PLED THE NECESSARY ELEMENTS OR FACTS THAT WOULD SUPPORT A CLAIM FOR TORTIOUS INTERFERENCE (COUNT IV).

To properly plead a claim for intentional interference with advantageous relationships, whether existing or prospective, a plaintiff must allege that:

> (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."

*Dear v. Devaney*, 83 Mass. App. Ct. 285, 294 (2013) (quoting *Blackstone v. Cashman*, 448 Mass. 255, 260 (2007); citing *Weber v. Community Teamwork, Inc.*, 434 Mass. 761, 781-782 (2001)). The loss of the relationships must be as a "direct result" of the intentional conduct by the defendant. *Cavicchi v. Koski*, 67 Mass. App. Ct. 654, 657 (2006) (quoting *Kurker v. Hill*, 44 Mass. App. Ct. 184, 191 (1998)).

None of the six plaintiffs identify a single customer or potential customer, of which the defendants were aware, with which a plaintiff had an advantageous relationship, contractual or otherwise, that was disrupted. The plaintiffs' cause of action is merely a "formulaic recitation of the elements," with a claim that "the defendants unlawfully harmed me." *See Iqbal*, 556 U.S. at 678. Consequently, the plaintiffs have failed to state a claim for tortious interference with an advantageous business relationship.

977524.1

**E.** **THE PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR VIOLATION OF M.G.L. C. 93A, § 11.**

The plaintiff's claim for relief pursuant to Section 11 of M.G.L. c. 93A is simply another restatement of its other state and federal claims. Section 11 of chapter 93A provides that "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice" may bring a civil action against the competitor. M.G.L. c. 93A, § 11

Just like any other claim, a chapter 93A claim is subject to dismissal for failure to state a claim. *See, e.g.*, *Massachusetts Sch. of Law v. ABA*, 142 F.3d 26, 42 (1st Cir. 1998); *JSB Indus. v. Nexus Payroll Servs., Inc.*, 463 F. Supp. 2d 103 (D. Mass. 2006)). To establish the liability of a defendant on a chapter 93A claim a plaintiff must demonstrate that the defendant's conduct "(1) falls within 'the penumbra of some common-law, statutory, or other established concept of unfairness'; (2) is 'immoral, unethical, oppressive, or unscrupulous'; and (3) causes 'substantial injury to [consumers or other businesspersons].'" *Famm Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 108 (1st Cir. 2009) (quoting *Jasty v. Wright Med. Tech., Inc.*, 528 F.3d 28, 37 (1st Cir. 2008)). "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a G.L. c. 93A violation is a question of law." *Chervin v. Travelers Ins. Co.*, 448 Mass. 95, 112 (2006). To state a claim, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 396 N.E.2d 149, 153 (1979). In addition, a plaintiff must demonstrate a causal connection between the conduct alleged to have violated chapter 93A and

26

the claimed loss in order to prevail on her consumer protection claim.  *Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 401 (2004).

The plaintiffs have alleged no actual injury resulting from alleged false statements, only a speculative reference to harm to their reputation and goodwill. *See*, *e.g.*, *Schwanbeck v. Federal-Mogul Corp.*, 31 Mass. App. Ct. 390 (1991) (explaining that false statements must have adverse consequences for a plaintiff in order to be actionable under Chapter 93A)**.** The plaintiffs have not cited to one instance of a customer or prospective customer having been influenced to not use their services, or any decrease in sales or revenues as a result of a false statement made by the defendants.

Finally, courts generally hold that if the legal theory underlying the chapter 93A claim fails, then there is no basis for maintaining the chapter 93A claim. *See, e.g., Massachusetts Sch. of Law*, 142 F.3d at 42 ("where allegedly defamatory statements do not support a cause of action for defamation, they also do not support a cause of action under [Chapter] 93A"). Here, none of the conduct that the plaintiffs claim is actionable under their chapter 93A claim states a claim under their other legal theories, and their chapter 93A claim fails as a matter of law as well.

### III.    CONCLUSION

Wherefore, defendant Martin Panayotov respectfully requests that the plaintiffs' Complaint be dismissed with prejudice, and that the Court award its costs and fees, and grant such other and further relief as is just and equitable.

977524.1

Respectfully submitted,

Defendant,
Martin Panayotov
By his counsel,

/s/ Kara Thorvaldsen
George C. Rockas BBO# 544009
Kara Thorvaldsen BBO# 660723
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
260 Franklin Street
Boston, MA 02110
(617) 422-5300

## Certificate Of Service

I, Kara Thorvaldsen, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).  I am not aware of any party who is a non registered participant, and therefore electronic filing is the sole means of service of this document.

/s/ Kara Thorvaldsen

977524.1